Filed 1/9/26  P. v. Jackson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JERMON HENDRICK JACKSON,<br><br>Defendant and Appellant. | F088288<br><br>(Super. Ct. No. VCF392612)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberely A. Donohue, Assistant Attorney General, Dina Petrushenko and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Jermon Hendrick Jackson guilty of committing three drive-by shootings, two in 2017 and one in 2019.[1] He was convicted of first degree murder with a special circumstance finding, attempted murder, criminal street gang conspiracy, shooting at an inhabited dwelling, and assault with a firearm. He was sentenced to prison for life without the possibility of parole, a determinate term of 68 years, plus an indeterminate term of 64 years to life.

On appeal, Jackson challenges the sufficiency of the evidence. He argues there was insufficient corroborating evidence to support the accomplice testimony regarding the two shootings committed in 2017. He also contends that the eyewitness testimony related to the 2019 shooting was unreliable and insufficient to establish his guilt. Jackson maintains that the mid-trial admission of enhanced surveillance videos and testimony related to the video evidence denied him of his constitutional rights.

We reject Jackson's claims and affirm the judgment.

## PROCEDURAL BACKGROUND

On August 31, 2023, the Tulare County District Attorney filed an amended information charging Jackson with the murder of Jesus Carrillo (count 1; Pen. Code,[2] § 187, subd. (a)), criminal street gang conspiracy (counts 2, 4, 7; § 182.5), willful, deliberate, premeditated attempted murder of Miguel P. (counts 3, 5; §§ 664, subd. (a), 187, subd. (a)), shooting at an inhabited dwelling (count 6; § 246), and assault with a firearm (counts 8, 9, 10; § 245, subd. (b)). As to count 1, it was alleged that the murder was perpetrated by means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)), and while Jackson was an active participant in a criminal street gang (§ 190.2, subd. (a)(22)).

---

[1] The shootings occurred on April 19 and 22, 2017, and December 28, 2019.

[2] Undesignated statutory references are to the Penal Code.

The amended information alleged as to counts 1, 3, 5, 6, 8, 9, and 10 that Jackson committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(c)). It was also alleged as to counts 1, 3, 5, and 6 that a principal personally and intentionally used and discharged a firearm that proximately caused great bodily injury and death (§ 12022.53, subds. (b), (c), (d), (e)(1)). As to count 3, it was alleged that Jackson personally inflicted great bodily injury (§ 12022.7, subd. (a)). As to counts 8, 9, and 10, the amended information alleged that Jackson personally used a .223 rifle during commission of the crime (§ 12022.5).

The amended information further alleged the following aggravating circumstances: as to all counts, the crime involved great bodily harm (Cal. Rules of Court,[3] rule 4.421(a)(1)), Jackson was armed with or used a weapon during the commission of the crime (rule 4.421(a)(2)), Jackson engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)), the crimes and objectives were predominately independent of each other (rule 4.425(a)(1)), the crimes involved separate acts of violence and threats of violence (rule 4.425(a)(2)), and the crimes were committed at different times and in separate places (rule 4.425(a)(3)). As to count 1, it was alleged the victim was particularly vulnerable (rule 4.421(a)(3)) and as to counts 1, 3, 5, 6, 8, 9, and 10 it was alleged the crime involved sophistication and planning (rule 4.421(a)(8)).

The jury found Jackson guilty of the non-gang related counts and found the non-gang related allegations true.

After a bifurcated trial on the gang-related allegations, the jury found true the gang-related allegations as to counts 1 and 3. The jury also found Jackson guilty as charged on counts 2 and 4. The jury found Jackson not guilty on count 7, and the gang-related allegations as to counts 5, 6, 8, 9, and 10 to be not true.

---

[3]     Undesignated rule references are to the California Rules of Court.

3.

On May 3, 2024, the trial court sentenced Jackson to life without the possibility of parole, a determinate term of 68 years, plus an indeterminate term of 64 years to life as follows: on count 8, six years, plus four years for the section 12022.5, subdivision (d) enhancement; on count 9, six years, plus four years for the section 12022.5, subdivision (d) enhancement to run concurrent with count 8; on count 10, six years, plus four years for the section 12022.5, subdivision (d) enhancement to run concurrent with count 9; on count 1, life without the possibility of parole, plus 25 years to life for the section 12022.53, subdivision (d) allegation to run consecutive to count 10; on count 3, seven years to life, plus 25 years to life for the section 12022.53, subdivision (d) allegation, plus three years pursuant to section 12022.7, subdivision (a), plus 10 years pursuant to section 186.22, subdivision (b)(1)(C) to run consecutive to count 1; on count 5, seven years to life plus 20 years pursuant to the section 12022.53, subdivision (c) to run consecutive to count 3; on count 6, five years, plus 20 years pursuant to section 12022.53, subdivision (c), to run consecutive to count 5. The terms on counts 2 and 4 were stayed pursuant to section 654.

<strong><u>FACTUAL BACKGROUND</u></strong>

## A. Guilt Phase

Hector M. was a member of the Varrio Woodlake Locos (VWL) gang in 2017, a subset of the Norteño gang from the Woodlake area.[4]  He often "hung out" with Jackson, who was a member of the Varrio Farmas Catorce (VFC) gang in 2017, which was a subset of the Norteño gang from the Farmersville area.

---

[4]     Hector M. initially denied involvement in the case because he was still a member of the Norteño gang.  However, pursuant to a plea agreement, he pled guilty to second degree murder and testified in this case in exchange for a sentence of 15 years to life. Hector M. is not currently a gang member.

**1. Shooting of Miguel P. on April 19, 2017**

On April 19, 2017, Hector M. met Jackson at Jackson's house. Jackson showed Hector M. his "personal gun," a .45-caliber Glock, before they left the house.

Hector M. drove Jackson in his (Hector M.'s) Lincoln to another location where they met P.D., a squad leader of the VWL gang.[5] P.D. showed Hector M. that he had a "Blue Steel .357 Magnum" gun. P.D.'s gun had a badge on it and was a "police edition" that belonged to his squad. Thereafter, Hector M. drove Jackson and P.D. to the store.

P.D. then drove Jackson and Hector M. in Hector M.'s car to an apartment complex in Ivanhoe. They drove through the parking lot of the complex one time. As they drove by, they saw about five people outside smoking, listening to music, and wearing blue. Hector M. thought they were Southern gang members. P.D. parked the car outside of the complex for about two minutes. Jackson wanted to "go back" to the apartment complex. When P.D. drove back to the apartment complex, both Jackson and P.D. were armed. Hector M. was not armed. Once they approached the people in the parking lot, shooting began.

P.D. shot his .357-caliber gun and Jackson shot his .45-caliber Glock.[6] They fired their guns over 10 times from Hector M.'s car and the individuals shot back. Then, P.D. drove away.

A neighbor heard about 13 gunshots. Another neighbor heard about 10 gunshots and observed a "smaller sedan" exit the complex at a high speed.

Tulare County Sheriff's Deputy Robert Richardson responded to the scene on April 19, 2017. When Richardson arrived, there were about 12 individuals in the center

---

[5]    P.D. was a squad leader of the VWL gang in 2017; Hector M. reported to him. Jackson was a squad leader of the VFC gang.

[6]    P.D.'s revolver did not expel any casings. Jackson's Glock expelled casings.

of the apartment complex surrounding Miguel P., who suffered from gunshot wounds. Miguel P. was a member of Loco Park, a subset of the Sureño gang.

There were 11 spent nine-millimeter casings, four .45-caliber casings, and fragmented bullets found at the scene of the crime. The .45-caliber casings were found in the roadway where Miguel P. had been shot. The nine-millimeter casings were found in an enclosed dumpster area.

Video surveillance was obtained from a nearby apartment. The video showed Hector M.'s Lincoln drive through the apartment complex once to "scope out a target." The Lincoln drove into the complex a second time and shots were fired. Muzzle flashes came out the window of the Lincoln in the direction of where Miguel P. was standing and near the dumpster where someone returned fire.

## 2. Shooting of Jesus Carrillo on April 22, 2017

On April 22, 2017, Hector M. picked up Jackson and drove him to Hector M.'s cousin's house before noon. Jackson carried a backpack that contained a .223-caliber rifle, described by Hector M. as a "little mini AR", and Jackson's "personal gun." Upon arrival they met other Norteño gang members, including Hector M.'s cousin and his cousin's younger brother, Nicholas P. Hector M. planned to go to Woodlake to receive a "disciplinary infraction" from his gang channel. He took Nicholas P. and Jackson with him in his Lincoln to ensure he would not get beaten too badly. On the way, however, Nicholas P. told Hector M. to drive to Ivanhoe.

Hector M. drove to Ivanhoe and drove up and down streets trying to find rival gang members. Nicholas P. sat in the front passenger seat, and Jackson sat in the rear passenger seat. They encountered Carrillo walking down the street wearing Sureño gang attire, a blue hat and long socks. Carrillo was a South Side Kings Southern gang member.

Hector M. pulled his Lincoln next to Carrillo. Nicholas P. began shooting at Carrillo with his .357-caliber gun, the same one that P.D. used in the shooting on April 19, 2017. Jackson also fired shots from his .223-caliber rifle. About eight total shots were fired, then Hector M. drove away.

A physician's assistant working at a clinic in Ivanhoe, heard the shots fired. He went outside to investigate and saw a man lying on the ground. The physician's assistant laid Carrillo on his back and performed CPR but did not get a pulse. Carrillo suffered seven gunshot wounds. He died from a single penetrating wound.[7]

Two .223-caliber shell casings were found at the scene, as well as a larger projectile "possibly" shot from a .357-caliber revolver.

Surveillance videos of the April 22, 2017 shooting showed what appeared to be the same Lincoln sedan used in the April 19, 2017 shooting. Two weapons shot at Carrillo from the car. One fired from the passenger seat, and another was fired from the rear passenger seat.

The surveillance videos were enhanced by the prosecution.[8] The driver was identified as Hector M., who was not shooting. The person in the rear passenger seat was more heavyset than Hector M. He had a dark complexion and wore a "Fedora-style cap." A rifle was fired from the rear passenger seat. The front passenger wore a ball cap and fired a "revolver style" handgun.

### 3. Investigation of the Shootings on April 19 and 22, 2017

On August 1, 2017, Farmersville Police Officer Kristine Barklow searched Jackson's residence. She found .45-caliber and .223-caliber ammunition inside the

---

[7]     The parties stipulated to this fact at trial.

[8]     The enhancements made on the April 22, 2017 videos magnified the images.

dresser of Jackson's bedroom. She also found a "mini AR-15" rifle inside a backpack. A .45-caliber Glock was found on Jackson's bed.

There was also a receipt for the purchase of ammunition at a Walmart store dated June 28, 2017. Video surveillance of the store on that day showed Jackson inside at the time the ammunition was bought. Jackson exited the store about 30 seconds after the male who purchased the ammunition.

Jessica Winn, an expert in firearms and ballistic analysis, opined that the .45-caliber cartridge casings found at the scene of the April 19, 2017 shooting were fired by the .45-caliber Glock found in Jackson's bedroom.

Winn also tested the .223-caliber AR-15 rifle. The results were inconclusive as to whether the two .223-caliber cartridge casings found at the scene of the shooting on April 22, 2017, were from the AR-15 rifle found in Jackson's bedroom. Winn explained that while the class characteristics agreed and the caliber was the same, the individual detail did not provide enough information on the test-fired casings because the rifle model did not mark well.

Jackson's phone was in the Ivanhoe area at the time of both shootings on April 19 and April 22, 2017.

On April 19, 2017, phone records revealed that two calls were made between Hector M. and Jackson at 8:31 p.m. There were 28 text messages sent between Hector M. and Jackson on that day, the first sent at 7:17 p.m. and the last sent at 8:26 p.m. The shooting occurred around 10:30 p.m. Text messaging between the pair resumed on April 20, 2017, at 12:51 a.m.

On April 20, 2017, Hector M. and Jackson exchanged 45 text messages.

On April 21, 2017, Hector M. and Jackson exchanged 31 text messages.

On April 22, 2017, Hector M. and Jackson exchanged 46 text. The shooting occurred around 4:15 p.m. There were no text messages sent between 2:45 p.m. and 4:45 p.m.

Based on the location of Jackson's phone, the messages between Jackson and Hector M. from April 19 to April 22, 2017, showed their communications ended shortly before Jackson's phone left the Farmersville area, and the communication did not start again until Jackson's phone was back in the Farmersville area. This tended to show that Jackson and Hector M. were together in Ivanhoe at the time of both shootings.

### 4. Shooting on December 28, 2019

On December 28, 2019, a car drove by and shot several rounds at a residence in Farmersville. S.Z., A.Z., O.Z., and F.Z.[9] were present, and initially told law enforcement that Jackson committed the shooting. Jackson drove by in a car similar to a "Lincoln" and thereafter drove in a "blue" car and shot at their residence several times.

### 5. Investigation of the Shooting on December 28, 2019

Earlier that month, on December 4, 2019, text messages showed Jackson tried to buy a nine-millimeter gun. Jackson was also seen standing next to a "blue Ford Fusion" at a gas station on December 24, 2019.

At 9:16 p.m. on December 28, 2019, Jackson sent text messages showing he had suffered a gunshot wound. When asked how it happened, Jackson sent another text message showing pictures of the residence where the shooting took place.

The investigation after the shooting revealed three spent .223-caliber rifle casings and 14 nine-millimeter casings at the scene.

On December 30, 2019, a gray car similar to a "Lincoln" parked in front of the "Jackson family" house.

---

[9] S.Z., A.Z., O.Z., and F.Z are all members of the Z family.

9.

On January 14, 2020, Jackson sent a text message that stated, " 'Fuck all the [members of the Z family] and that fool [F.Z.]' "

## B. Gang Phase

Tulare County Sheriff's Deputy Oscar Sanchez and Farmersville Police Sergeant Luis Frausto testified as gang experts. Each town has its own "turf" or subset of the Norteño gang. VFC is a subset of the Norteño gang predominately located in Farmersville. VWL is a subset of the Norteño gang located in Woodlake.

VFC and VWL gang members work together to promote their gang. The Sureño gang is their biggest rival.

Jackson was an active and participating member of the VFC subset of the Norteño gang at the time of both April 2017 shootings and the December 2019 shooting. Hector M. was an active member of the Norteño gang at the time of the April 2017 shootings. Carrillo was an active member of the Sureño gang, South Side Kings subset, at the time of the April 22, 2017 shooting.

Norteño gang members are required to commit crimes for the benefit of the gang. This includes eliminating rival gang members. The April 2017 and December 2019 shootings were committed for the benefit and at the direction of the Norteño criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members.

## DISCUSSION

## I. Corroboration of Accomplice Testimony

Jackson argues independent evidence did not sufficiently corroborate Hector M.'s accomplice testimony as required by section 1111 regarding the April 19 and 22, 2017 shootings. He asserts that his convictions on counts 1 through 4 should be vacated. The People maintain sufficient independent evidence corroborated Hector M.'s testimony.

We agree with the People that the accomplice testimony was sufficiently corroborated to satisfy section 1111's requirements.

**A. Analysis**

Section 1111 provides that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

" 'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 95.) The corroborating evidence standing alone need not be substantial. (*People v. Abilez* (2007) 41 Cal.4th 472, 505 (*Abilez*).) Moreover, "[t]he evidence 'need not independently establish the identity of the victim's assailant.' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32.) In order for the jury to rely on the accomplice's testimony, it must find evidence that "tends to connect the defendant with the commission of a crime in such a way so as to reasonably satisfy the jury that the complaining witness is telling the truth; the corroboration is inadequate if it requires aid from the testimony of the witness to be corroborated in order to connect the defendant with the alleged offense." (*People v. Fujita* (1974) 43 Cal.App.3d 454, 470; see also *People v. Rissman* (1957) 154 Cal.App.2d 265, 277.)

" 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' " (*Abilez, supra,* 41 Cal.4th at p. 505.) We determine whether accomplice testimony is

sufficiently corroborated by viewing the evidence in the light most favorable to the judgment. (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 650.)

It is undisputed that Hector M. was an accomplice within the meaning of section 1111. Hector M.'s testimony implicated Jackson in the attempted murder of Miguel P. and murder of Carrillo.[10] The only question is whether the prosecution presented to the jury sufficient corroborating evidence connecting Jackson to the shootings.

Jackson specifically identifies several pieces of evidence that he argues did not corroborate Hector M.'s testimony: (1) video surveillance footage from the shootings; (2) Jackson's possession of weapons and ammunition matching the casings from the scenes; (3) common gang membership; (4) the receipt for purchase of ammunition at Walmart; and (5) cell phone records. He further suggests Hector M. was an unreliable witness, seeking to minimize his role to secure leniency. After review of the record, we conclude the corroborating evidence was sufficient to connect Jackson "to the crime *independently* of the accomplice's testimony." (*People v. Romero and Self, supra*, 62 Cal.4th at p. 36.)

When Hector M.'s testimony is set aside, independent evidence connected Jackson to the weapons used in the April 2017 shootings. A .45-caliber Glock and ammunition were found in Jackson's bedroom, which matched casings found at the scene on April 19, 2017. A rifle and .223-caliber ammunition were also found in Jackson's bedroom, and the same casings were found at the scene on April 22, 2017. A ballistics expert opined that the .45-caliber casings found at the scene of the shooting on April 19, 2017, were fired by Jackson's Glock. Possession of a weapon like the weapon used in the commission of the crime provides evidence connecting the defendant with the crime to sufficiently corroborate the accomplice's testimony. (*People v. Henderson* (1949) 34

---

**10** The jury was instructed with CALCRIM No. 335, regarding accomplice testimony.

Cal.2d 340, 343–346 [accomplice testimony was corroborated in part by evidence that the defendant purchased a .410 shotgun one day prior to the attempted robbery and a witness testified she saw the defendant discharge a .410 shotgun at the time of the crime]; *People v. Trujillo* (1948) 32 Cal.2d 105, 111 [accomplice testimony corroborated in part by evidence tending to show that the bullet which killed the victim could have come from the same gun in the defendant's possession prior to the crime and which was found in his room after his arrest].)

A receipt for the purchase of both .45-caliber and .223-caliber ammunition were found in Jackson's bedroom after the shootings. Video surveillance at the store where the ammunition was purchased showed Jackson was present.[11] While not overwhelming, possession of ammunition that matched the same caliber found at the scene of both shootings, as well as Jackson's presence at the store at the time of purchase, further supports the inference that he used the Glock and rifle to perpetrate the shootings, corroborating Hector M.'s testimony. (*People v. Avila* (2006) 38 Cal.4th 491, 569 [bullet casings found at the scene of the crime corroborated the accomplice's testimony that he saw the defendant with the same caliber guns on the night of the crime]; *People v. Valdez* (2012) 55 Cal.4th 82, 97, 148 [ballistics evidence tended to connect the defendant to the crime and provide sufficient evidence of accomplice's testimony, where law enforcement found the same caliber bullets in the defendant's residence as found in the victim's head].)

---

[11]     The ammunition itself was purchased by a male individual. Video surveillance showed Jackson also present at the Walmart store at the same time and date the ammunition was purchased, exiting the Walmart about 30 seconds after the individual who made the purchase. As noted above, although this evidence may be slight, this tends to link Jackson with the purchase of ammunition that was the same caliber found in both shootings.

Hector M.'s testimony was also corroborated by video surveillance. Video of the shooting on April 19, 2017, showed Hector M.'s car drive through the apartment complex and multiple muzzle flashes coming from both the car window and return flashes from near the dumpster. Neighboring residents heard several gunshots. This evidence tended to verify Hector M.'s testimony that Jackson and P.D. fired their guns over 10 times from Hector M.'s car and the individuals shot back.

Video surveillance of the shooting on April 22, 2017, showed a man with a dark complexion that was heavier than Hector M. firing a rifle from the rear passenger seat of Hector M.'s car. The male individual had a similar build and complexion to Jackson. The video also showed the same car used in the shooting three days earlier. The surveillance video, taken together with the rifle found in Jackson's bedroom, tends to place Jackson as the rear backseat passenger and connect him to the murder of Carrillo. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303 [the evidence is " 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth' "].) Although Jackson could not specifically be identified in the videos, courts have routinely held that evidence independent from accomplice testimony does not need to establish the identity of the defendant. (*People v. Romero and Self, supra*, 62 Cal.4th at p. 32.)

Cell phone records corroborated Jackson's connection to the April 2017 shootings by placing him in the vicinity of the shootings at the approximate time they occurred. (*People v. Hall* (2024) 104 Cal.App.5th 1077, 1092 [accomplice's testimony corroborated in part by evidence showing the GPS pings on the defendant's ankle monitor that matched the accomplice's testimony as to where the defendant traveled on the day of the robbery].)

Specifically, on both April 19 and 22, 2017, Jackson's phone travelled from Farmersville to the Ivanhoe area during the time of the shootings. There were also

multiple cell phone calls and messages between Hector M. and Jackson during the relevant time.[12] The communication on both days ended shortly before Jackson's phone left Farmersville, and there was no further communication between Hector M. and Jackson until Jackson's phone was back in Farmersville. This evidence tended to show that Hector M. and Jackson were together in Ivanhoe during the time of the shootings, providing sufficient corroborating evidence of Hector M.'s testimony. (*People v. McDermott* (2002) 28 Cal.4th 946, 986 [accomplice testimony corroborated in part by several telephone calls between the defendant and the accomplice that collectively lasted over an hour on the day before and the day after the murder].)

Jackson's commission of multiple, similar crimes corroborates Hector M.'s testimony. (*People v. Blackwell* (1967) 257 Cal.App.2d 313, 320–321 ["similarity in the commission of crimes in a given locality is … a circumstance tending to corroborate the testimony of an accomplice"]; *People v. Romero and Self*, *supra,* 62 Cal.4th at p. 34 [evidence of similarly perpetrated crimes corroborates an accomplice's testimony].) All three crimes involved drive-by shootings; two victims were rival gang members.[13]

We acknowledge that Jackson's gang membership standing alone is insufficient corroborating testimony. But here there is additional corroborating evidence, including the video surveillance, Jackson's phone data, possession of firearms and ammunition, and commission of drive-by shootings in a similar location, which provided further support that Jackson had a motive and opportunity to commit the crimes, and did so. (*People v. Rissman* (1957) 154 Cal.App.2d 265, 278 ["[t]he entire conduct of the parties, their

[12] Jackson and Hector M. exchanged approximately 150 text messages from April 19 through April 22, 2017. There were calls between Hector M. and Jackson hours before the April 19, 2017 shooting.

[13] Miguel P. was a member of the Loco Park Sureños and Carrillo was a member of the South Side Kings Sureños.

15.

relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration"]; c.f. *People v. Pedroza*, *supra*, 231 Cal.App.4th at p. 651 [there was no evidence about the defendant's acts or conduct, except that he shared gang membership and associated with the other perpetrators hours after the crime took place].)

Jackson does not argue that any of this corroborating evidence was improperly admitted. In these circumstances, the jury's determination as to whether Hector M.'s accomplice testimony was sufficiently corroborated is binding unless the evidence does not tend to connect him to the shootings. (See, *Abilez*, *supra*, 41 Cal.4th at p. 505.) Jackson argues that none of the evidence corroborates Hector M.'s testimony because it did not pinpoint his precise location or specifically identify him as the perpetrator. But "[t]he corroborating evidence does not need to independently prove guilt. The evidence simply must support the accomplice testimony and permit a reasonable inference that the accomplice's testimony is true." (*People v. Hall* (2024) 104 Cal.App.5th 1077, 1092.)

Construing the evidence in favor of the judgment, we conclude Hector M.'s testimony was corroborated by sufficient evidence which tended to connect Jackson with the commission of the attempted murder of Miguel P. and murder of Carrillo.

**B. Jackson's Constitutional Rights Were Not Violated**

Jackson argues his convictions should be set aside because uncorroborated accomplice testimony violates his constitutional rights. He fails to make any additional arguments for his position other than there was insufficient evidence to corroborate Hector M.'s testimony under section 1111.

We nonetheless find that there is sufficient corroborating evidence other than Hector M.'s accomplice testimony under section 1111. Moreover, even if Jackson made an adequate constitutional argument, it is without merit because "[t]he accomplice testimony rule is not constitutionally based." (*In re Mitchell P.* (1978) 22 Cal.3d 946,

949.)  The rule regarding accomplice testimony under section 1111 is based on English common law and not formed on any constitutional grounds.  (*Ibid*.)

Federal courts have also rejected the rule.  The Ninth Circuit held it is settled law that "a conviction may be based on the uncorroborated testimony of an accomplice .… [Citation]  This is the rule unless the testimony of the accomplice is incredible or unsubstantial on its face."  (*United States v. Turner* (9th Cir. 1975) 528 F.2d 143, 161.)  Jackson's claim that the alleged uncorroborated accomplice testimony violated his constitutional rights is meritless.

## II. Sufficiency of the Evidence of the Shooting on December 28, 2019

Jackson argues the prosecution introduced insufficient evidence to convict him of the shooting on December 28, 2019, which violated his right to due process under the Fifth and Fourteenth Amendments.  (See *In re Winship* (1970) 397 U.S. 358, 364; *Jackson v. Virginia* (1979) 443 U.S. 307, 315–316.)  He further contends that the eyewitness accounts regarding the shooting were inconsistent, and no further evidence established he was the shooter.  The People maintain the eyewitness accounts and additional evidence was sufficient to support Jackson's convictions.

We find the evidence sufficient to support the verdicts.

### A.  Additional Background

#### 1.  Testimony of S.Z.

In an initial interview with law enforcement, S.Z. stated that Jackson was seated in the left rear passenger seat of the car; she was "100 percent positive that the shooter was [Jackson]."  S.Z. claimed she recognized Jackson as "Big [H]ead" because of his "big ol' head."

S.Z. was later interviewed by Sergeant Frausto.[14]  She observed Jackson drive by three times in a "gray" or "silver" car, which she described to be "similar to a Lincoln." Minutes later, she observed a "blue or gray" car drive by with both driver's side windows down.  S.Z. saw Jackson sitting in the rear backseat behind the driver.  She described Jackson as a "black male, heavyset, big long hair, and possibly wearing a black shirt." S.Z. remarked that she could "clearly see [Jackson's] face."  She believed he yelled something at her brother, and immediately thereafter she heard more than 10 gunshots. S.Z. was shown a photo lineup and she positively identified Jackson as the shooter.

At trial, S.Z. testified she was present at the residence during the shooting on December 28, 2019, but failed to identify Jackson as the perpetrator or recollect the details.

### 2. Testimony of A.Z.

On December 28, 2019, A.Z. identified Jackson as the shooter by "his hair."  Two minutes prior to the shooting, A.Z. saw Jackson drive by his residence at a high rate of speed in a "gray car."

A.Z. claimed at trial that he failed to recall any of the events and did not know Jackson.  Nonetheless, he admitted that he told the truth to law enforcement when he was first interviewed.

### 3. Testimony of O.Z.

On December 28, 2019, O.Z. told law enforcement that he was shot at by "the same daily Norteños."  O.Z. also stated that "the Jacksons" committed the shooting.  He heard shots being fired at his residence and observed a "blue Ford Fusion" travel at a high speed down the street.

---

[14]     These interviews took place on both December 28, 2019, and January 2, 2020.  A summary of S.Z.'s interviews with Frausto is set forth below.

At trial, O.Z. claimed he was "on the street" when he heard gunshots at his house. O.Z. did not recognize the three individuals in the car who committed the shooting and denied identifying anyone at the scene.

### 4. Testimony of F.Z.

On December 28, 2019, F.Z. identified Jackson as the shooter. He saw "the Jacksons" pass by the residence. A short time later, they passed by again in a "white" car, the car came to a stop about five feet from his driveway, and Jackson began shooting at F.Z.'s family. F.Z. picked up his little brother and ran for cover.

F.Z. testified at trial that he was not home at the time of the shooting. Thereafter, he stated that he was "on the street" about 15 houses down from his residence when he heard "gunshots." He did not know who shot at the house and did not know Jackson. When a video was played of F.Z.'s interview with law enforcement; he confirmed he was in the video.

### 5. Standard of Review

The test for sufficiency of the evidence on appeal is whether the prosecution presented evidence from which a reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156.) "Evidence meeting this standard satisfies constitutional due process and reliability concerns." (*People v. Boyer* (2006) 38 Cal.4th 412, 480.)

" ' " '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " ' " (*Carter*, *supra*, 36 Cal.4th at p. 1156.)

### 6. Analysis

Jackson argues that the only evidence used to convict him of the shooting on December 28, 2019, were unreliable eyewitness accounts. First, he maintains the eyewitness accounts varied regarding the type and color of car he was riding in. However, these statements had nothing to do with the identification of Jackson.

Moreover, he claims S.Z.'s identification was unreliable because another person reminded her of Jackson's name.[15] He maintains S.Z. provided an inconsistent statement because his hair was "pulled back" and not styled in an "Afro" when she positively identified him in a photo lineup. However, these statements consistently identified Jackson as the shooter.

A single witness is sufficient to prove the defendant's identity as the perpetrator of a crime. (*Boyer, supra*, 38 Cal.4th at p. 480; Evid. Code, § 411.) A testifying witness's identification out of court is probative and can be sufficient evidence of the defendant's guilt even where the witness does not confirm the identification in court. (*Boyer*, at p. 480; see also Evid. Code, § 1238; see also *People v. Johnson* (1980) 26 Cal.3d 557, 576–578.) Indeed, " 'an out-of-court identification generally has *greater* probative value than an in-court identification, even when the identifying witness does not confirm the out-of-court identification.' " (*Boyer*, at p. 480.)

S.Z. identified Jackson as the shooter and gave a physical description of him that matched his description. She also identified Jackson in a photographic lineup.

A.Z. identified Jackson as the shooter and confirmed at trial that he told the truth during his interview with law enforcement on the day of the shooting. F.Z. also positively identified Jackson at the scene. This evidence alone is sufficient to prove

---

[15] Jackson only argues that S.Z.'s eyewitness account was unreliable and inconsistent; he fails to address any other eyewitness accounts.

Jackson's identity as the shooter on December 28, 2019.  (See, *Boyer, supra*, 38 Cal.4th at p. 480.)

The prosecution also offered evidence that S.Z., A.Z., and F.Z. may have had a motive to falsely recant their identification of Jackson.  A gang expert testified that Jackson was a participant in the Norteño VFC gang at the time of the December 2019 shooting.  The residence was targeted because it was associated with a Sureño gang member.  From this evidence, a jury could infer that S.Z., A.Z., and F.Z. told the truth to responding officers at the scene but recanted their statements at trial because of fear or intimidation by rival gang members.  (See, e.g. *People v. Cuevas* (1995) 12 Cal.4th 252, 274–275; see also *People v. Chavez* (1980) 26 Cal.3d 334, 364 [unlike cases where "the record contained no concrete basis to credit the witness' prior identification over his trial testimony, the prosecution … presented evidence which both explained and discredited the witness' inconsistent testimony at the time of trial"]; *People v. Ford* (1981) 30 Cal.3d 209, 213–214 [in the circumstances of this case the repudiation of the out-of-court identification itself provided the jury with a basis on which it could have discredited the identifying witness's trial testimony in favor of his out-of-court identification; the reason for the witness's failure to make a positive identification at trial was that in the interim he had become reluctant to testify against the defendant].)

Moreover, "when the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court."  (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497; see *People v. Whisenhunt* (2008) 44 Cal.4th 174, 200 [an appellate court does " 'not reweigh evidence or a witness's credibility' "].)  Here, defense counsel cross-examined the witnesses and explored the reasons for not confirming their out of court identification.  The jury was also instructed with CALCRIM No. 226, which discussed how to evaluate eyewitness testimony.  It was up to the jury to determine

whether the eyewitness statements were credible, and any contradictions or other weaknesses in the witnesses' testimony were matters to be argued to the trier of fact. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 939.)

Further, eyewitness evidence was not the only evidence linking Jackson to the crime. The eyewitness identification was corroborated by other independent evidence. (See *Johnson*, *supra*, 26 Cal.3d at pp. 578–579 [although eyewitness testimony at trial was inconsistent and exaggerated from the witness's prior testimony, where there was other corroborating evidence that the crime occurred, our high court found that substantial evidence supported the defendant's conviction].)

For example, on the evening of December 28, 2019, Jackson sent a text message and a picture indicating he suffered a gunshot wound, together with a picture of the December 28, 2019 crime scene. He also sent text messages that indicated he harbored negative feelings about F.Z. From this evidence, a reasonable jury could infer that he suffered a gunshot wound and was at the scene of the crime on December 28, 2019. A reasonable jury could also infer that Jackson had a motive to shoot at the residence because of his ill will toward F.Z.

Evidence established that two vehicles drove by the residence on the day of the shooting, December 28, 2019. Jackson initially drove by in a "gray" car, similar to a Lincoln. Then, Jackson drove by in the rear passenger seat of a "blue" Ford Fusion. Jackson was seen standing next to a "blue Ford Fusion" at a gas station a few days prior to the shooting. A "gray" Lincoln was parked in front of the "Jackson family" residence after the shooting occurred. Viewed in the deferential light required, the jury's decision that this circumstantial evidence, along with the various eyewitness accounts, constituted sufficient evidence that Jackson committed the shooting on December 28, 2019, was sound.

Jackson's arguments in support of a different conclusion focus on the inconsistency of the police investigation. Jackson contends there was no actual evidence that placed him in the "blue Ford Fusion" or the "gray" car on the day of the shooting. However, his arguments are misplaced. Our question is not whether the prosecution's case could have been stronger, but whether there is a minimum of substantial evidence to support the jury's decision "beyond a reasonable doubt." (*Abilez, supra,* 41 Cal.4th at p. 504.)

In sum, there was substantial evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that Jackson committed the shooting on December 28, 2019, to support his convictions on counts 5 through 10.

## III. Admission of Enhanced Videos at Trial

Jackson claims he was ambushed by the introduction of an enhanced surveillance video of the April 22, 2017 shooting at trial violating the discovery statute[16] and his state and federal constitutional rights. He contends he was only able to review the video on the same day it was introduced into evidence, and thus he was denied a fair trial and the right to present a defense. The People respond that Jackson's fundamental constitutional rights were not violated, and even assuming there was a violation, any error was harmless beyond a reasonable doubt.

There was no violation on this record.

### A. Additional Background

During motions in limine, the prosecution sought to admit enhanced surveillance video footage to aid the jury when viewing the evidence.

---

[16] While Jackson only mentions the statute governing discovery in criminal cases under section 1054 et seq., considering his entire argument and his citation to *People v. Hughes* (2020) 50 Cal.App.5th 257, we construe this reference to involve an alleged violation of the discovery statute in addition to his constitutional claim.

Before trial, six surveillance videos were admitted by the prosecution showing the shooting on April 22, 2017.  During trial, the prosecution enhanced two of those videos.  The prosecution provided defense counsel with the enhanced videos and still photographs from the videos the next day.  Defense counsel and the prosecutor watched the enhanced videos together for the first time the same day they were introduced at trial.

The jury was shown the enhanced videos.  Tulare County Sheriff's Detective Brandon Van Curen testified regarding what they showed.  The prosecution also showed the jury several still photographs from the enhanced videos.  There was no objection.

Upon completion of Van Curen's testimony outside the jury's presence, defense counsel informed the trial court that it wanted to consult a technology expert and indicated that he may file a motion to continue.  The prosecutor did not object to defense counsel obtaining an expert.

The following week, defense counsel informed the trial court that it had consulted a technology expert and would let the parties know by the end of the week if he sought to do anything additional with the enhanced video.

The prosecutor sought to admit the enhanced videos into evidence.  Jackson's counsel did not object; he reserved an objection stating, "[t]he damage is already done."  The trial court admitted the videos into evidence.

There were no further objections or requests regarding the enhanced videos.

**B.  Jackson's Claim is Forfeited**

The People argue Jackson forfeited his challenge to the admission of the enhanced surveillance video.  We agree.

To preserve an appellate challenge to the admission of evidence, a defendant must make a timely objection to the evidence, making "clear the specific ground of the objection."  (Evid. Code, § 353, subd. (a); *People v. Seijas* (2005) 36 Cal.4th 291, 302.) "An objection is sufficient if it fairly apprises the trial court of the issue it is being called

24.

upon to decide." (*People v. Scott* (1978) 21 Cal.3d 284, 290.) Moreover, to preserve a constitutional claim arising out of a trial court's decision to exclude or admit evidence, the defendant must raise the constitutional claim in the trial court. (*People v. Riggs* (2008) 44 Cal.4th 248, 292.)

Defense counsel failed to object to the admission of the enhanced videos on the grounds now asserted and failed to raise any constitutional claims at trial. While defense counsel reserved an objection and complained the enhancements damaged his case, no further issues or specific objections were raised. Jackson's claim is forfeited.

For the first time in his reply, Jackson argues that if the issue is forfeited, we should reach the merits of his claim because his counsel rendered ineffective assistance. Generally, arguments made for the first time in a reply brief need not be addressed by the reviewing court. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) But because the People addressed the merits of Jackson's contentions, we exercise our discretion to reach the merits too. (See, e.g. *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party. [Citations.] Indeed, it has the authority to do so."].)

### C. Standard of Review

Ordinarily, an appellate court reviews discovery matters for abuse of discretion. (*People v. Moya* (1986) 184 Cal.App.3d 1307, 1312.) When determining whether a trial court has abused its discretion, the appellate court will not substitute its judgment for that of the trial court. (*Ibid*.) Discretion means sound judgment of the court exercised in accordance with the proper legal authority. (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

### D. No Violation of the Discovery Statute

It is settled that section 1054 et seq. was amended by Proposition 115 to include "both constitutional and statutory language authorizing reciprocal discovery in criminal

cases." (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 364.) These amendments were made in order to provide a criminal defendant with a fair and speedy trial. (*Ibid*.)

Section 1054.1, subdivision (f) requires the prosecutor to disclose to the defense "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of … scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at trial." Disclosure must be made at least 30 days before trial, but "[i]f the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately." (§ 1054.7.)

In *People v. DePriest* (2007) 42 Cal.4th 1, 37 (*DePriest*), the prosecution discovered two new partial shoe prints on the eve of trial and immediately provided the evidence to the defense. The defendant argued that the new evidence violated the prosecution's duty to provide discovery in a timely fashion. (*Ibid*.) He asked for a continuance and a mistrial if a continuance was not granted. (*Ibid*.)

Our Supreme Court concluded that there was no discovery violation or unfairness requiring either a continuance, mistrial, or exclusion of the shoe print evidence. (*DePriest, supra,* 42 Cal.4th at p. 37.) The court found that "the discovery statutes did not 'mandat[e]' a continuance or other sanction" because there was no unreasonable delay, and the prosecutor informed the trial court and defense counsel of the evidence soon after he obtained it. (*Id*. at p. 38; accord *People v. Panah* (2005) 35 Cal.4th 395, 459–460 [no violation of the discovery statutes or constitutional error by prosecution failing to disclose a pathologist's new report just prior to testimony when the report was prepared during trial and provided to the defendant at the earliest possible opportunity]; see *People v. Verdugo* (2010) 50 Cal.4th 263, 287 [no violation of the reciprocal-discovery statute when "[t]he prosecutor produced the notes to the defense the same

morning that he received them, which satisfies the statutory requirement of immediate disclosure of materials that become known during trial"].)

Here, the surveillance video was enhanced during trial and was immediately disclosed to defense counsel. Indeed, the prosecutor and defense counsel "watched them all together for the first time." Defense counsel consulted an expert regarding the enhanced videos. But no further action was taken.

Jackson contends that the prosecution had a duty to turn over the video surveillance evidence to the defense, any expert statements about the evidence, and enhancements *before* trial began.[17] (§ 1054.1, subds. (c) and (f).) There is no requirement that disclosure occur in all circumstances prior to trial. (§ 1054.7.) Jackson received the original surveillance videos prior to trial, and the enhanced videos were provided to Jackson at the earliest possible opportunity. This was proper. (*DePriest, supra,* 42 Cal.4th at p. 37.)

Jackson asserts his case is like *People v. Hughes*, *supra*, 50 Cal.App.5th at page 278, where the court grappled with the issue of whether notes containing accident reconstruction calculations and diagrams serving as basis for the expert's testimony were disclosed untimely in violation of section 1054.1, subdivision (f). The Fourth District found that the prosecution failed to comply with the statutory disclosure requirements under section 1054. (*People v. Hughes* at p. 281.) The court reached this conclusion because the " ' "need for pretrial discovery is greater with respect to expert witnesses than it is in the case of ordinary fact witnesses." ' " (*Id*. at p. 279.) The prosecutor also knew the expert had been working on the case and taking notes for a few months yet still

---

[17] Jackson erroneously cites section 1054, subdivisions (c) and (f). There is no section 1054, subdivision (f). Moreover, section 1054, subdivision (c) states that the purpose of the discovery statute is "[t]o save court time in trial and avoid the necessity for frequent interruptions and postponements." Thus, we assume Jackson meant to cite section 1054.1, subdivisions (c) and (f).

failed to disclose the notes until after the trial began, increasing the seriousness of the error. (*Id*. at p. 280.)

Our case is distinguishable. The enhanced videos were provided to defense counsel immediately after they were made. This is not an issue where the prosecution had discoverable material for months prior to trial, but did not disclose it until after the trial started. (*People v. Hughes*, *supra*, 50 Cal.App.5th at pp. 279–280.) This is also not a situation involving expert discovery. (*Id*. at p. 279; see also, *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1117.)

The prosecution "has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense." (*In re Littlefield* (1993) 5 Cal.4th 122, 135; *People v. Hogan* (1982) 31 Cal.3d 815, 851 [no duty to obtain evidence or conduct tests on behalf of the police or prosecution or " 'gather up everything which might eventually prove useful to the defense' "].) Thus, although Jackson complains the enhanced videos surprised him, the prosecution was not required to perform the enhancements sooner. This is especially true because Jackson was put on notice the prosecution intended to enhance the surveillance videos to aid the jury in viewing without objection, and the videos were provided to Jackson prior to trial. Jackson's counsel had equal opportunity to perform the enhancements.

### E. Jackson's Constitutional Rights Were Not Violated

We also reject Jackson's claim of constitutional error. "[E]vidence is not suppressed unless the defendant was actually unaware of it and could not have discovered it ' "by the exercise of reasonable diligence." ' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1049.) This is all that is needed to guarantee a fair trial. (*Ibid*.) Moreover, " 'due process concerns itself with the fairness of the trial as a whole.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 474.)

Jackson had the videos before trial; he knew the prosecution intended to make enhancements for ease of viewing. Defense counsel consulted an expert regarding the enhanced videos and decided no further action was necessary. Jackson could not have been caught off guard to such an extent that we might conclude he was unable to prepare a meaningful defense and denied due process and a right to a fair trial. There was no constitutional violation.

## F. Jackson Suffered No Prejudice

Even if error occurred, either by statutory or constitutional compulsion, it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The burden is on the defendant " 'to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm.' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1103.)

Jackson sought no continuance, and he made no showing that his defense would have been different had he been provided the enhanced videos earlier. Because Jackson had the surveillance videos and was put on notice the prosecution intended to enhance them before trial, he was aware of both the existence of the evidence and its potential significance. He had sufficient opportunity to fairly meet the evidence when it was presented to the jury.

Jackson's counsel also had the ability to cross-examine the testifying witnesses regarding the enhanced videos. Both witnesses were subject to recall. (*People v. Verdugo, supra,* 50 Cal.4th at p. 283 [a violation of reciprocal discovery statute may be cured where the defendant's attorney is allowed to recall a witness for further cross-examination].) The failure to recall the witnesses cannot be attributed to the prosecutor's belated production of the enhanced videos containing information already in Jackson's possession prior to trial.

Jackson fails to complain about the admission of still photographs extracted from the enhanced videos. The photos depicted the same images and thus, admission of the videos could not have resulted in prejudice; without an affirmative showing of prejudice, there is no ineffective assistance of counsel

## IV. Admissibility of Testimony Describing Surveillance Videos

Jackson argues the trial court violated his state and federal due process right to a fair trial by allowing Detectives Hebrard[18] and Van Curen to testify about what they observed in the surveillance videos. He maintains the testimony amounted to impermissible expert opinion testimony.

The People respond Jackson forfeited this claim. Reaching the merits, the testimony was proper, and any error was invited or harmless. We agree with the People.

### A. Additional Background

On cross-examination, Detective Hebrard observed gunshots from the passenger's side of the car. He saw two suspects, "[o]ne appeared to be a Hispanic male." The other individual in the backseat "appeared to be wearing a Fedora-style hat." The driver appeared to be wearing a "white shirt."

After viewing the video "many times," Van Curen opined that shots were fired from the passenger seat and from the backseat of the car. Van Curen initially could only see a "silhouette" of the individual in the backseat.

After the video was enhanced and the images enlarged, Van Curen saw the back passenger wearing a "Fedora-style" hat. He further identified the back passenger as "dark complected, possibly an African-American" who was "more heavyset than [Hector M.] based off of the facial features." Van Curen also saw that the backseat passenger was firing a "rifle" because it was longer than a handgun.

---

[18] Tulare County Sheriff's Detective Robby Hebrard.

30.

On cross-examination, Van Curen believed the back passenger was Jackson in the video because of "all the evidence" in the case. Van Curen further identified Jackson in the photo because he was "a darker-complected" with "a larger body build than … [Hector M.]"

There was no objection to any of the testimony at trial.

## B. Jackson Forfeited His Claim

Our Supreme Court has routinely held that a trial counsel's failure to object to an evidentiary error on the same ground asserted on appeal forfeits the issue. (Evid. Code, § 353; *People v. Dykes* (2009) 46 Cal.4th 731, 756.) Jackson failed to object at any time during Hebrard's and Van Curen's testimonies. Rather, after Van Curen's testimony, defense counsel expressly stated he had "[n]o objection."

Jackson maintains his counsel compelled a timely objection to the testimonies of Hebrard and Van Curen when he reserved an objection and complained the enhanced videos were damaging to his case. We disagree. If Jackson's counsel believed that the testimonies of Hebrard and Van Curen were inadmissible on the basis he now raises on appeal, he was required to say so to preserve the contention for review.[19] Instead, he remained silent and registered no objection to the testimony itself. Jackson forfeited his claim that Hebrard and Van Curen rendered inadmissible expert opinion testimony.

Jackson's contention that the admission of the evidence rendered his trial fundamentally unfair in violation of his federal and state constitutional rights is also forfeited. (See *People v. Riggs, supra,* 44 Cal.4th at p. 292 ["To the extent defendant on appeal raises a federal constitutional claim distinct from his claim that the trial court

---

**19** While defense counsel reserved an objection for late discovery, he never followed up with a further objection nor did he object on the specific grounds now raised on appeal. (*People v. Scott, supra,* 21 Cal.3d at p. 290 [an objection must fairly appraise the trial court of the issue it is being called upon to decide].)

abused its discretion … he forfeited this claim by failing to identify that ground in his objections to the trial court"].)

Jackson argues that if his claims are forfeited, his counsel rendered ineffective assistance. Thus, we will reach the merits of his contention. (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1325 [the reviewing court does not need to decide whether counsel's performance was deficient before considering the prejudice suffered by the defendant, " ' "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice … that course should be followed" ' "].)

### C. Standard of Review

Jackson argues the trial court erred when it allowed Hebrard and Van Curen to testify as to the content shown in the surveillance videos, arguing the testimony was an inadmissible expert opinion. Such a ruling is reviewed for abuse of discretion. (*People v. Mixon* (1982) 129 Cal.App.3d 118, 132.)

### D. Invited Error

The People argue that defense counsel elicited the entirety of Hebrard's testimony and a portion of Van Curen's testimony about which Jackson now complains and therefore any error was invited. We agree.

" 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the [defendant] cannot be heard to complain on appeal …. [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.)

In *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1138, the defendant contended the trial court erred in ruling that he could be impeached with a prior conviction. However,

the court reasoned that defense counsel first elicited before the jury the fact that the defendant had been in prison and was imprisoned for his assault on a peace officer. (*Id.* at p. 1139.) The court held that the doctrine of invited error barred the defendant from challenging the trial court's ruling on appeal. (*Ibid*; accord *People v. Williams* (2009) 170 Cal.App.4th 587, 620 [any error was invited and held harmless where testimony about which the defendant complained on appeal was elicited by his own counsel at trial].)

Jackson's counsel asked Hebrard about identifying characteristics of any of the individuals in the car on the night of the shooting. Because Jackson's counsel made a tactical choice to initiate questioning regarding the physical characteristics of the individuals Hebrard saw in the videos, any error was invited.

Jackson's counsel also questioned Van Curen about whether he believed Jackson was the perpetrator in the video and asked about identifying characteristics. Given the nature of the questions, we find that this was again part of defense counsel's trial strategy and directed to elicit a certain answer.

The admission of Hebrard's and Van Curen's testimonies on cross-examination was invited.

### E. The Testimony Was Admissible

In any event, the trial court did not err. A lay witness may offer an opinion if it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of [the witness's] testimony." (Evid. Code, § 800.) "[T]he identity of a person is a proper subject of nonexpert opinion." (*People v. Perry* (1976) 60 Cal.App.3d 608, 612 (*Perry*).)

In contrast, an expert witness may offer opinion testimony if the subject matter is "sufficiently beyond common experience" such that the expert's opinion "would assist the trier of fact." (Evid. Code, § 801, subd. (a).) An expert's opinion must be based on matter (including his special knowledge, skill, experience, training, and education) that

the witness personally knows or perceives—whether or not admissible—that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates.  (*Id*. at subd. (b).)

Our Supreme Court held that identifying a criminal defendant in surveillance photographs or videos is the proper subject of lay witness opinion testimony.  (*People v. Leon* (2015) 61 Cal.4th 569, 601; see *Perry, supra,* 60 Cal.App.3d at p. 612 ["The identification testimony of the witness viewing the film of the robbery may be considered lay opinion on the question of the identity of the person depicted therein inasmuch as the witness was not qualified as an expert in film reading or interpretation"]; *People v. Son* (2020) 56 Cal.App.5th 689, 695–697 (*Son*).)

Jackson argues the testimony could not possibly be the subject of a lay witness because Hebrard and Van Curen were not percipient witnesses to the shooting.  However, the Third District was presented with a similar argument and rejected it.  In *Perry,* the defendant argued that the officers' identification had to be based on their actual perception of a crime.  (*Perry, supra,* 60 Cal.App.3d at p. 613.)  The court disagreed and found it proper for the officers to base "their identification opinion upon their prior contacts with [the] defendant, their awareness of his physical characteristics on the day of the [crime], and their perception of the film taken of the events."  (*Ibid*.)  *Perry* focused on the "same rationale" which permits nonexpert testimony on identity of handwriting "as an aid in identification of the defendant as the miscreant."  (*Id*. at p. 614.)  The court applied that rationale to the "evidence of the identity of a pictorially depicted subject when such evidence is based upon personal knowledge of the person's physical characteristics at the time of the film depiction."  (*Ibid*.)

Similarly, in *Leon*, *supra*, 61 Cal.4th 569, our Supreme Court also rejected the defendant's argument that post-arrest contact between the detective and the defendant was insufficient to support the detective's opinion that the defendant was shown in

surveillance videos of two robberies, deeming it a "distinction without a difference." (*Id.* at pp. 600–601.) The Supreme Court explained, "It is undisputed [the detective] was familiar with [the] defendant's appearance around the time of the crimes." (*Id.* at p. 601.) The detective had contact with the defendant after he was arrested, and "[q]uestions about the extent of [the detective's] familiarity with [the] defendant's appearance went to the weight, not the admissibility, of his testimony." (*Ibid.*) "Moreover, because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was [the] defendant." (*Ibid.*) The *Leon* court committed no abuse because the detective's testimony was based on his relevant personal knowledge and aided the jury. (*Ibid.*)

This court also upheld the identification of the defendant in a robbery surveillance photograph as lay witness testimony by officers who did not witness the incident but had prior "personal knowledge" of the defendant's appearance, which aided the jury in identifying the defendant. (*People v. Mixon*, *supra*, 129 Cal.App.3d at pp. 130, 135.)

We apply these authorities to our case. Hebrard's and Van Curen's testimonies did not amount to expert witness opinion testimony.

Turning to whether the testimony was that of a lay witness, Hebrard and Van Curen essentially described what they saw in the video. Neither Hebrard nor Van Curen identified Jackson as the perpetrator on direct examination; they only pointed out the characteristics of the backseat passenger based on what was played in the video.[20] We fail to see any lay witness opinions expressed in Hebrard's and Van Curen's testimonies.

---

[20] At no point did Van Curen or Hebrard identify Jackson from the video on direct examination. Although Van Curen identified Jackson on cross-examination, as stated above, this argument fails based on invited error. Nonethless, it was proper. (*Perry*, *supra*, 60 Cal.App.3d at p. 613.) Hebrard's testimony did not identify Jackson at all but only acknowledged that the backseat passenger appeared to be "wearing a Fedora-style hat."

As the *Son* court soundly asked, "[w]hy does it become an opinion just because [the detective] saw it in a video?" (*Son, supra*, 56 Cal.App.5th at p. 697.)

But supposing Hebrard's and Van Curen's testimonies constituted lay witness opinion testimony, we conclude it was admissible because it was helpful to the jury. (See, *Son, supra*, 56 Cal.App.5th at p. 697 [the standard as to admissibility of lay opinion testimony is whether it is helpful to the trier of fact].) Hebrard and Van Curen both watched the video several times and were able to describe characteristics from the individuals in the video that may have been missed by the jurors who only watched the video a single time in court. Van Curen testified that Jackson's build was heavier, and he had a darker complexion than Hector M., which aided the jury in differentiating the perpetrator from the other individuals in the car. Hebrard's and Van Curen's knowledge of firearms also helped the jury identify the firearm and the bullet strikes.

The trial court did not abuse its discretion in admitting the testimonies of Hebrard and Van Curen because even if it was lay witness opinion testimony, it was helpful to the jury. And any improper weight was counterbalanced by the fact that the surveillance video was played for the jurors and thus, they "could make up their own minds about whether the person shown" in the video was Jackson. (*Leon, supra*, 61 Cal.4th at p. 601.) There was no state law error or violation of Jackson's constitutional rights.

### F. No Prejudice

Jackson argues he suffered prejudicial error by the admission of the testimony. He maintains that the error was of constitutional magnitude because he was denied the right to a fair trial, and thus we should analyze the error under *Chapman v. California, supra,* 386 U.S. at p. 24.

Evidentiary errors regarding the admissibility of witness testimony are generally analyzed under the harmless error standard that asks whether there is a reasonable probability that the error affected the outcome as set forth in *People v. Watson* (1956) 46

36.

Cal.2d 818, 837.  (See *People v. Melton* (1988) 44 Cal.3d 713, 745 [where trial court erred in admitting lay witness testimony, any error held harmless under *Watson* standard].)

Nonetheless, admission of the testimony was harmless under either standard. Because we find no prejudice on this record, Jackson's claim of ineffective assistance of counsel necessarily fails.

As we discussed, the surveillance videos were shown to the jury for their own interpretation.  (*Leon, supra,* 61 Cal.4th at p. 601.)  The jury was aware that neither Hebrard nor Van Curen were witnesses to the shooting; their testimony was based only on viewing the video and their knowledge of Jackson's characteristics.

Hebrard did not identify Jackson as the shooter.  Van Curen also did not identify Jackson as the shooter until specifically asked by defense counsel on cross-examination whether he believed the individual in the passenger backseat was Jackson.  Van Curen also explained the reasons why he believed it was Jackson and that his opinion was based on all the evidence presented in the case.  This is not a situation where the detectives blindly identified Jackson without reason.

The jury was provided with the proper instructions on how to evaluate Hebrard's and Van Curen's testimonies.  CALCRIM Nos. 332 and 333 were given, which instructed the jury with how to evaluate expert and lay witness opinion testimony.  CALCRIM No. 226 provided various factors for the jury to consider in evaluating *any* witness's testimony.  We presume the jury understood and followed the instructions.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

The evidence adduced at trial supporting guilt was strong.  The April 22, 2017 shooting turned on the corroborated accomplice testimony, firearm and ammunition evidence, phone records, and the actual surveillance video itself, which showed an

individual with similar characteristics as Jackson shooting a rifle from the rear passenger seat of Hector M.'s vehicle.

In view of the instructions given and all the evidence presented at trial, any assumed error was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

GUERRA, J.[†]

WE CONCUR:


HILL, P. J.


DETJEN, J.

---

[†]    Judge of the Fresno Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.